UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------x
MICHAEL SCHIAVONE and                :
HARBOR CIRCLE, LLC,                  :
                                     :
                Plaintiffs,          :
                                     :
v.                                   :  Civil No. 3:08CV429(AWT)
                                     :
NORTHEAST UTILITIES SERVICE          :
COMPANY and THE CONNECTICUT LIGHT    :
AND POWER COMPANY,                   :
                                     :
                Defendants.          :
------------------------------------x

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

The plaintiffs, Michael Schiavone ("Schiavone") and Harbor Circle, LLC ("Harbor Circle"), brought this action against the defendants, Northeast Utilities Service Company ("NUSCO") and The Connecticut Light and Power Company ("CL&P"), setting forth a claim in Count I for contribution under § 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. ("CERCLA"), a claim in Count II under the Connecticut Environmental Protection Act, Conn. Gen. Stat. § 22a-16 ("CEPA"), and a claim in Count III for declaratory relief under CERCLA. The defendants and the plaintiffs have each moved for summary judgment, and the plaintiffs have represented that their claims in Count II and Count III are moot and do not address these counts in their opposition to the defendants' motion. The defendants have

1

asserted a counterclaim against the plaintiffs for contribution under § 113 of CERCLA, which is not a subject of the cross-motions for summary judgment. For the reasons set forth below, the defendants' motion for summary judgment is being granted and the plaintiffs' motion for summary judgment is being denied.

I.  **FACTUAL BACKGROUND**

In 1968, H. Kasden & Sons, Inc. ("Kasden") acquired Lot 2, the site of a scrap yard in North Haven, Connecticut. In March 1981, Michael Schiavone & Sons, Inc. ("Schiavone & Sons") purchased stock in Kasden. Thereafter, Schiavone & Sons ran the scrap yard. In October 1984, Schiavone acquired Lot 2A, which is adjacent to Lot 2. On or about December 31, 1984, Kasden transferred Lot 2 to Schiavone. This action relates to remediation of Lot 2 and Lot 2A (collectively, "the Property") that was required because the soil and ground water were contaminated by polychlorinated biphenyls ("PCBs").

During the period from 1968 to 1978, the defendants managed their inventory of used transformers in three ways. Some transformers were transferred to other NUSCO-affiliated utility companies for continued use as transformers. Others were sold to third-party utility companies for continued use as transformers. Still others were sold as scrap metal for the commercial value of the metal. The agreements with purchasers of scrap metal were for the purchase of scrap metal only, and contained no reference

2

to the disposal of PCBs or any other hazardous substance.

During the period from 1971 through 1978, the defendants arranged with Kasden for the sale of used transformers as scrap metal. The sale price to Kasden for a used transformer was based on the market value of the metal in the transformer, and the larger the transformer in question the higher the sale price would be. An indication of a transformer's size is the number of kilovolt-amperes ("KVA") of output a transformer can deliver at a rated voltage and frequency without exceeding a specified rise in temperature. A transformer with a KVA rating of 10 has less copper metal than a 1000-KVA transformer.

By way of example, on January 12, 1973, Kasden sent correspondence to NUSCO stating:

> We are pleased to quote the following for miscellaneous scrap in Willimantic, Danielson, Essex, New Britain, Niantic, New Milford, Winsted, Oxford, Meriden, Waterbury, Millstone Points, East Hampton, Bristol, Shelton, and Mystic as follows:
>
> 1. <u>Miscellaneous Steel Scrap</u> - We would provide a 10 yard scrap bucket, truck and crane service when necessary. Price would be based on "Boston Market - American Metal Market" - Average Dealer price on #2 Steel, less $11.00 per gross ton. This would cover various accumulations of steel, cast iron, and miscellaneous steel products.
>
> 2. <u>Transformer</u> - Price would be based on 90¢ per KVA for #2 Cooper, price of 38.50¢ based on Wholesale Buying Prices - American Metal Market. For each 1¢ change in the price of #2 Cooper, we would change the transformer price 3½¢ per KVA. This would cover transformers up to 25 KVA. Other transformers would be negotiated.
>
> 3. <u>Mixed Aluminum</u> - Price would be based on lowest price for 1100 series aluminum as shown under Wholesale Buying

>     Prices, American Metal Market, less 12½¢ per pound.
>
>     4. <u>Miscellaneous Materials</u> - Price to be based on American Metal Market - Dealer Buying Prices on date of pick up or equivalent.

(Aff. of Alfred J. Roy in Supp. of Defs.' Mot. of Summ. J. ("Roy Aff.") (Doc. No. 99) Ex. 5 - Letter of C. Sterling of Kasden to R. Hale of NUSCO, dated Jan. 12, 1973.)

Kasden would purchase and pickup a variety of types of commercial scrap metal, including used transformers that had been prepared for scrapping, at CL&P locations within Connecticut. The plaintiffs have provided evidence that after the used transformers were picked up by Kasden and taken to the Property, they were cut open with a blowtorch, oil in the transformers was burned off, and the copper was removed. Then, the remainder of the transformer was cut up, and the copper was sold to a copper smelter and the steel to a steel mill. The oil in the transformers was never tested for PCBs by Kasden.

In September 1973, NUSCO implemented a written policy (the "Askarel Policy") for all of its operating companies, including CL&P, mandating, <u>inter</u> <u>alia</u>, certain procedures for the disposal of transformer oil. In particular, the Askarel Policy required that used transformers be drained of oil containing PCBs using methods prescribed in the Askarel Policy. The Askarel Policy provided, with respect to transformer disposal:

<u>Transformer Disposal</u>

The ultimate disposal of an askarel-filled transformer may be accomplished in either of two ways.

a. Complete drainage and dismantling with the proper disposal of the askarel and askarel-soaked components as described earlier in the section "Disposal Procedures and Services."

b. Disposition of askarel transformers by means of junk or scrap dealers should be avoided unless a transformer is first drained, followed by soaking of the interior with a suitable solvent. Accumulated liquids and washings are to be disposed of as described earlier.

(Roy Aff. Ex. 7 - Memorandum of H. F. Pomeroy of NUSCO re: Askarel, dated Sept. 11, 1973.) In addition, by no later than 1976, the defendants were selling used transformer oil for commercial value to third parties or disposing of the oil by means of oil disposal services.

Around May 2002, the Connecticut Department of Environmental Protection discovered PCB contamination on the Property. Subsequently, Schiavone and Joseph A. Schiavone Corporation ("Schiavone Corp."), the successor in interest to Schiavone & Sons, retained KU Resources, Inc. ("KU Resources") to conduct an investigation and remediate the Property. In September 2004, Harbor Circle acquired Schiavone Corp.'s interest in the Property. The defendants incurred costs totaling approximately $1.37 million in connection with the investigation and the remediation of the Property.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248

(internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.  Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at 252.

## III. DISCUSSION

"Congress enacted CERCLA to address the serious environmental and health risks posed by industrial pollution, and CERCLA was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Celanese Corp. v. Martin K. Eby Const. Co., Inc., 620 F.3d 529, 532 (5th Cir. 2010) (quotation marks omitted.) "To accomplish this, CERCLA imposes strict liability for environmental contamination upon four broad classes of potentially responsible parties . . . [one of which is] any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances. . . ." Id. (citing 42 U.S.C. § 9607(a)). The issue presented by the parties' cross motions for summary judgment is whether the defendants "arranged", as that term is defined for purposes of § 9607(a), for the disposal of a hazardous substance, i.e. PCBs.

The plaintiffs contend that 40 C.F.R. § 761.2 creates a rebuttable presumption that transformers manufactured prior to July 2, 1979 contained PCBs, and because the defendants are

8

unable to prove the level of concentration of PCBs in the transformers sold to Kasden, the defendants' arrangement with Kasden is presumed to have involved transformers containing PCBs. However, the plaintiffs misconstrue the regulation.

On June 29, 1998, the Environmental Protection Agency ("EPA") amended certain rules and regulations relating to the use, manufacture, processing, distribution in commerce and disposal of PCBs. See 63 Fed. Reg. 35,384 (June 29, 1998) (codified at 40 C.F.R. §§ 761.1-761.398). Section 761.2 is entitled "PCB concentration assumptions for use." The EPA's final rule and the interpretative guidelines published by the EPA make it clear that this regulation is intended to apply only to transformers that are in use or in storage for reuse, and that the presumption created by the regulation does not apply in the context of disposal of transformers. The regulation provides that, as an alternative to using the allowable assumptions, a person may use one of two alternative means of establishing the PCB concentration in a transformer. See 40 C.F.R. § 761.2(b). The final EPA rule states:

> Those persons wishing to establish the PCB concentration of a transformer, rather than making an assumption in accordance with today's rule, may do so. PCB concentration may be established: (1) By testing the equipment; or (2) from a permanent label (i.e., a nameplate), mark or other documentation from the manufacturer of the equipment indicating its PCB concentration at the time of manufacture; and service records or other documentation indicating the PCB concentration of all fluids used in servicing the

9

equipment since it was first manufactured.

63 Fed. Reg. at 35,389. The final EPA rule makes it clear that the "assumption policies" do not apply when transformers are being disposed of. "The assumption policies in §761.2 do not apply when electrical equipment is being disposed of. At that time, the owner or operator of PCB equipment must know its actual PCB concentration and use the proper disposal method." 63 Fed. Reg. at 35,389. This point is reiterated in the EPA's PCB Q and A Manual, dated January 2009, which provides guidance on the interpretation of the PCB regulations. The manual contains the following question and answer in the section on "§761.2 Assumptions":

> Q: Do the PCB concentration assumptions in §761.2 apply to use, storage and disposal, or only use?
>
> A: The assumptions apply to use and to storage for reuse. They do not apply to disposal or to storage for disposal. For example, if you are the owner of a transformer manufactured before July 2, 1979, that contains $3 pounds of fluid other than mineral oil at an unknown concentration, while the transformer is in use you must assume it is a PCB Transformer, i.e., that it contains $500 ppm PCBs. Once you decide to dispose of the transformer, you are no longer required to assume that it is a PCB Transformer. You must know the concentration at the time of disposal in order to assure compliance with the regulations. However, if you place the transformer into storage for disposal without having determined its concentration, EPA recommends that you store it as if it contains PCBs at regulated levels to avoid a violation.

Revisions to the PCB Q and A Manual (January 2009), p. 6, http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/qacombined.pdf (last

visited March 21, 2011). Thus, there is no support for the plaintiffs' contention that § 761.2 creates a rebuttal presumption that transformers manufactured prior to July 2, 1979 contained PCBs.

Moreover, even if the transformers sold by the defendants to Kasden contained oil and that oil contained PCBs, under the circumstances present here, the defendants were not "arrangers" under § 9607(a). In <u>Burlington N. & Santa Fe Ry. Co. v. United States</u>, - - - U.S. - - -, 129 S. Ct. 1870 (2009), the Supreme Court concluded that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." 129 S. Ct. at 1879 (citing <u>United States v. Cello-Foil Prods., Inc.</u>, 100 F.3d 1227, 1231 (6th Cir. 1996)). The Supreme Court reasoned that:

> In common parlance, the word "arrange" implies action directed to a specific purpose. <u>See</u> Merriam-Webster's Collegiate Dictionary 64 (10th ed. 1993) (defining "arrange" as "to make preparations for: plan[;] ... to bring about an agreement or understanding concerning"); <u>see</u> <u>also</u> <u>Amcast Indus. Corp.</u>, 2 F.3d, at 751 (words "'arranged for' ... imply intentional action").

<u>Id.</u> "[D]iscussing state of mind in a CERCLA case appears inappropriate. . . . [However], [n]otwithstanding the strict liability nature of CERCLA, it would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has otherwise arranged for disposal .

. . . of hazardous substances." United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1231 (6th Cir. 1996)(citations omitted; internal quotation marks omitted).

It is undisputed that the defendants had a specific purpose of disposing of used transformers, and in the case of the sales to Kasden, by selling them as scrap metal. The defendants have produced evidence that would support a conclusion that their specific purposes with respect to their dealings with Kasden did not extend beyond that, i.e., to disposing of any oil that was in the transformers or any PCBs that were in such oil. The available documentation of the defendants' relationship with Kasden addresses only the purchase of metal for scrap. Transformers are specifically mentioned as a category of metal, and while there are specific provisions relating to copper, there is no indication that any oil in the transformers was a factor in the parties' thinking with respect to the transaction. Also, while the defendants sold or otherwise disposed of transformer oil during the relevant time period, they never sold or otherwise disposed of transformer oil to Kasden.

The plaintiffs have created a genuine issue of material fact as to whether the defendants sold Kasden any transformers that contained oil, and also as to whether any such oil contained PCBs. However, the defendants' specific intent to dispose of the transformers themselves is not enough to make them "arrangers"

under § 9607(a), even if the defendants had knowledge that oil was in the used transformers when they sold them to Kasden. See Burlington, 129 S. Ct. at 1880 ("While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity 'planned for' the disposal . . ."). The plaintiffs have produced no evidence that could support a conclusion that the defendants had as a purpose in their dealings with Kasden disposing of transformer oil containing PCBs. Consequently, the plaintiffs have not created a genuine issue of material fact as to whether the defendants arranged for the disposal of a hazardous substance, i.e., PCBs, as contemplated by § 9607(a).

In light of the court's conclusion that the defendants are not liable under CERCLA, the defendants' counterclaim for contribution under § 113 of CERCLA is moot.[1]

---

[1] The court notes that the defendants also request costs of this action. "Neither CERCLA § 107, the liabilities and defenses provision, nor § 113, which authorizes contribution claims, expressly mentions the recovery of attorney's fees." Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 174 (2d Cir. 2002)(citing Key Tronic Corp. v. United States, 511 U.S. 809, 815 (1994)). "Thus, expenses incurred solely in preparation for litigation cannot be recovered as response costs unless they significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." Id.(internal quotation marks omitted).

**IV. CONCLUSION**

For the reasons set forth above, Count II and Count III of the Complaint are dismissed with prejudice, and Plaintiffs' Motion for Summary Judgment (Doc. No. 101) is hereby DENIED and Defendants' Motion for Summary Judgment (Doc. No. 96) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants and close this case.

It is so ordered.

Dated this 22nd day of March 2011, at Hartford, Connecticut.

                                                  /s/AWT
                                      Alvin W. Thompson
                            United States District Judge